Good morning, your honors. May it please the court. My name is Dallin Holt. I'm with the law firm of Holtzman Vogel, and I'm here on behalf of the Soto Palmer Appellant Intervenors. I'll be handling the argument for the consolidated Palmer matters, and my colleague Caleb Acker will handle the argument for Mr. Garcia and the related matter that follows this. I would like to reserve five minutes for rebuttal. As far as redistricting cases go, this matter is unique for two primary reasons. First, it is unique here because plaintiffs successfully used Section 2 of the VRA to claim that an existing majority-minority district by Hispanic Citizen Voting Age Population, or HCVAP, that provided equal access to the polls, did not provide an equal opportunity for Hispanic voters in the Yakima Valley to elect their candidates of choice. Second, this case is doubly unique in that for the first time in a Section 2 vote delusion context, plaintiffs proposed and the district court adopted a remedial map in an attempt to cure Hispanic vote delusion by further diluting the Hispanic vote in the remedial district, by injecting white Democrats and Native Americans and decreasing the amount of Hispanics in the district, went from 52.6% of HCVAP to 50.2% of HCVAP, more than 2% of a shift. And just to clarify for the court— But still remaining the majority, correct, with respect to the Hispanic? Yes, Your Honor. And there might be some reference to various numbers. The process, when the litigation started, the census releases data every year, and so this litigation has been going on for a while, and as more census data has been released, we've been able to go from 2019 numbers to 2020 to 2021. So all the numbers are looking back, but this gives us a more realistic and accurate representation. So the 52.6 and 50.2 are using the 2021 U.S. census numbers. In doing this unique remedial district, the district court admitted that, quote, the Latino citizen voting age population of LD14, that's the remedial district, is less than that of the HCVAP in the enacted district. However, the court said that such dilution was necessary for Hispanic voters to, quote, elect candidates of their choice to the state legislature, close quote. Because after all, who knows better than what the Hispanic electorate wants in the Yakima Valley than the non-Hispanic voters in the Yakima Valley? And all of this was done under the backdrop of the enacted LD15, electing a Latina Republican, Nikki Torres, in the Yakima Valley, the only district in question here, to the state Senate by more than 35 points in a contested election against a white Democratic candidate. Many of these cases rely on pronostications of what will happen in the future. We have the unique ability. We actually have elections that took place under both the enacted map and the remedial map. We don't need to guess about what will happen because we know what did happen. And it elected a Latina Republican by 35 points. Given this precarious position, it is little wonder why both the state and the Soto Palmer plaintiffs used the majority of their pages, not defending the merits and the remedy, but by arguing that the appellate intervenors lack appellate standing. For that point, I would like to start with discussing appellate standing for the intervenors. Intervenors, under current Ninth Circuit precedent, if they are able to show independent individualized harm and a personal stake in the matter, they are able to show separate and apart standing to move forward and appeal this case. This is in the Attei matter from 2016. The matter is factually very similar to ours. In Attei, we're dealing with Maui County, Hawaii. A ballot initiative was passed that placed a moratorium on genetically engineered farming. Lawsuits followed that challenged that government action. The mayor and the city council were opposed to the initiative in the first place. As such, they did not defend the constitutional ballot measure. Some intervenors that owned farms, organic farms, that would have been harmed by the repeal of this ordinance intervened. The district court struck down the government action, the initiative, for preemption purposes, and the government chose not to appeal. So the intervenors appealed. The government there made the exact same argument, the Soto Palmer plaintiffs, and the government makes here that if they don't appeal it, nobody can. Well, moving past that, with respect to Mr. Trevino, who was supposedly classified by race in the drawing of the remedial map. So with respect to liability, and then we can talk about remedy, I don't see what the asserted harm of the racial classification being traceable to the liability determination. So perhaps you can give us that foundation. Yes, Your Honor. I'm happy to do that. Now, as the court knows, we have two matters here that are consolidated, the merits and the remedy. And this question first is dealing with the merits with the liability. Yes, Your Honor. It is impossible to separate the finding of dilution in the merits case that led to the drawing of the remedy. Now, it is not the finding or the being able to justify whether or not somebody was rightfully sorted by race. Supreme Court has held over and over again that the act of sorting by race is sufficient for Article 3 injury. The act. As such, Palmer plaintiffs, their request of the district court was to sort voters by race in the Yakima Valley. Mr. Trevino lived in LD15 and he lived in the remedial LD14. He was a member of the race that was that, if granted, would be racially sorted. So the court has the Supreme Court has always held that it is an individualized harm under the 14th Amendment for these individuals that are going to be sorted by race. And that's enough to get you through the door. You can get a seat at the table. Well, let me let me ask you this is to me. This is the most important question in your case. Yes. Is that so let's say there's a declaration that the map, the original map was violated, the Voting Rights Act or violated for whatever the violation is. And the remedy is we're going to redraw the map by one inch. That's the remedy. And so, in effect, there is no effect on Mr. Trevino at all. It's literally a one inch change in the map. In that instance, how would the harm of the violation, the liability declaration, how what redress would your client be seeking if the if the map was moved one inch? Again, it is the harm of actual sorting of race. So we have to look at what is what remedy. So let's let's assume let's assume that happened. What remedy would your client be seeking in that instance? If what the effect of it was, was the map being moved by one inch that he not be sorted by race, that whatever remedy is. So let's assume that happened. Yes. So what relief is he seeking? It happened. It was a bad map and a declaration is a bad map. What is the injury at that point? Like what what what relief in a complaint would he be seeking? The relief in the as an intervener, there's no question that the relief he asked is that there's pleadings below where Mr. Trevino asked that the court find do not find excuse me, that the court not find dilution. And because of that, that the court not sort him on the basis of race. But normally go ahead. Normally when you when we have a lawsuit and someone is injured by what someone does, they say I'm injured and here's how my injury is redressed. Yes. And so I'm trying to figure out how is how is his if the map is effectively not changed? How is his injury redressed? What what relief? What would make him whole? Just a declaration that this was a bad thing or or is there something else he's asking for? No, the Mr. Trevino be made whole to not be sorted on the basis of race. And so what we have here is the uncontested facts that the commissioners passed L.D. 15 and the uncompromising criteria was race. It was Hispanic see that it was that was negotiated back and forth between the Republican, the Democrat commissioners. Palmer plaintiffs argued that they didn't go far enough. They needed to sort it further. Mr. Trevino did is did not want to be sorted by race. And so as an intervener defendant, he was coming in to protect his own individual interests. Now, but as to his individual interests. Yes. Are you're are you alleging that Mr. Trevino suffered vote dilution? No, that he was sorted on the basis of race. OK, well, that's what's confusing here. So you're not asserting a vote dilution claim as it pertains to the remedy? Yes. OK, but as to the liability? No. Yeah. You cannot separate the liability. But on even on remedy, is there any any case where a racial classification alone is sufficient to support standing? For a vote dilution. Yes, Your Honor. When you look at shot to Alexander Covington, all of these cases under shot to it is a fundamental injury to the individual rights of a person. Alexander, the racial classification itself is the relevant harm. Covington, it is the segregation of plaintiffs, not the government's line drawing. And doesn't that does that belong to him individually rather than as a group? According to Shaw? Yes. So you're. But so it has to trace to him. The vote. Yes. The 14th Amendment is an individual right as a shot to held. The fact that thousands of people are being sorted on the basis of race does not automatically convert that to a generalized grievance. It just makes a lot of people that have a personal interest in this case. So another question, because it seemed the other ground that you're arguing, apart from vote dilution, at least as to the remedy had to do with an equal protection claim. Correct. Yes, Your Honor. OK, so I'm looking at your objections to the. I guess they were the initial objections in December to the judge's proposal. And then the only thing I and I didn't see any objection there or claim of equal protection. So where do I look in the record to find the preservation of the equal protection claim? As it regards to Mr. Trevino. Yes. Or anybody. Interveners, I should say. I mean, it seems that Mr. Campos kind of falls out. You haven't really argued too much about that person. And we can talk separately about Mr. Barra and his election. So it kind of falls to Mr. Trevino. Yes, Your Honor. When you win the court, I would direct the court to Mr. Trevino's motion to intervene in the court below. He makes it very clear that he is intervening to protect his 14th Amendment right to not be sorted by race. Now, there might be some other reasons why he was there. And yes, he would have loved to have the government standing by him to defend his personal rights. But the fact that the government chose not to do that does not automatically convert that to Mr. Trevino standing in place for the government. When the court looks to a Tate, it is very clear there are cases such as Bethune Hill and Hollingsworth that stand for the proposition, the correct proposition that you cannot stand in place for the government where the government is the only party that is harmed. So once you have these hearings on the map and we're narrowing in now on what the shape of the table is going to be, where does he make it clear to the court that he's asserting an equal protection claim? Well, the remedy flows from the order of the court where the court made it abundantly clear that his fundamental goal was to combine Hispanic communities of interest in the Yakima Valley. That was not hidden. It was openly talked about on the record over and over again. And again, the harm here is being sorted by race. It is not being sorted wrongly by race or rightly by race or if there's a good faith sorting by race. The fact that there was a racial sorting of any kind, the court has held over and over again. The Supreme Court has held over and over again that is sufficient for Article 3 standing purposes for that intervener to be able to come in because that harm is individual. Now, just real quick, just 30 seconds, Your Honor. I just wanted to touch on the basis of the actual remedy itself. That the attempt to cure dilution by further diluting, never been done before. Further, this is a textbook case per Upham Supreme Court case that this district was not narrowly tailored. 13 out of 49 of the legislative districts were altered in the remedial map when only one district was part of the plaintiff's claims. Upham, where the Supreme Court found that district court abused discretion in drawing a remedial map, that changed four out of 27 when the claim only involved two. The downstream changes in our case greatly outweigh what the court found was not narrowly tailored in Upham. Further... And when you're saying the downstream changes, you mean the changes that flow over to other districts as well? Yes, Your Honor. Outside of the Yakima Valley that was... Outside of the Yakima Valley. Yes, Your Honor. So, it's basically a two-to-one revision in the map? For Upham, yes, Your Honor. Right. How should the district court have changed 14 and 15 to comply with Section 2 without somehow altering the neighbor's... Yeah, the benefit that we have here, Your Honor... Have to do that. Of course. There is going to be some change. You've got to get population from somewhere. Right. And we acknowledge that. But it needs to be done in the most narrowly tailored possible way. And we have the benefit here that the plaintiff submitted over 10 possible remedial maps. Every single one of those other maps that their experts testified on the record were full and complete remedies, were less disruptive than the enacted map. And by less disruptive, I look at... Let me pull up just one of the Proposal 5, 5A. There were some variations, so they moved to a 5 and a 5A. What's the most modest of the plaintiff's proposed maps? In Map 5, it moved only 190,000 people compared to over 500,000 people that were moved in the enacted remedy map. It changed only four districts as opposed to 13 districts. It only redrew districts in the Yakima Valley region. It did not go across the entire state as the remedial map did. I read all of your arguments, and the one question I had really is, in effect, you're asking us to reweigh the district court's findings. I mean, obviously, there's a plethora of possible maps. You're not happy with the one chosen. District court came up with one particular one. But wouldn't we be reweighing the evidence? No, Your Honor. This is a legal error that the court would review. What standard did the court apply when he was drawing the map? And that is a de novo review. This is not a matter of evidence. The court failed to follow his requirement to enact a map that was narrowly tailored and that followed the policy interests of the state, meaning drawing districts that don't overly favor one political party to the other. Over 10 districts, their partisan makeup were changed to favor the Democratic Party. Two of those districts were flipped by two to three percentage points from performing Republican districts to performing Democrat districts. Neither one of those districts were in the Yakima Valley. And the plaintiff's other illustrative maps made it very clear that it was not required to do that, to enact a remedy. But yet the court still did that. And so we would ask that the court, at the very least, ensure that the court follows the guidelines to have a narrowly tailored map that only makes the number of changes that are possible. And with that, if the court has no further questions, I reserve the time. Well, I do have one question. Have you dropped your challenge to the fact that this should have been a three-judge court rather than a single-judge court? No, Your Honor. We have not dropped that challenge. I mean, at the outset, you had said you, of course, demanded a three-judge court with respect to the constitutional claims, but you had said interveners do not demand a three-judge court to hear the plaintiff's statutory claims. So now I'm hearing or reading in your brief something different, and your argument suggests something different. As you get into litigation, there were decisions that had to be made to not fight everything. However, this is as it pertains to the standing of this court and jurisdiction of this court, and that cannot be waived. So today I could have been up here for hours discussing the various jingles factors and Senate factors, but we still very much believe this unique situation we are in with these potential colliding opinions of a three-judge panel in a district court were here because of the misapplication of that. These should have both involved maps that were statewide legislative district maps. Those should have both been heard by a three-judge panel, and it would have solved the confusion that we have right now by having both of them heard at the same time by the same panel. Well, I don't find it too confusing, but we'll find out when we have a second argument. So thank you. Thank you, Your Honor. Counsel, counsel, counsel, I just wanted to let you know, although your time is almost totally used up, I'll give you two minutes for rebuttal. Good morning, Your Honors. I may have pleased the court. I'm Andrew Hughes on behalf of the state of Washington. I'm going to start by addressing why interveners lack standing, and then I'll turn things over to Ms. Harless to address the merits. And I want to take standing in two pieces because interveners bring two separate appeals, so they need to establish standing independently for each. On the liability appeal, they lack standing because the court's liability order does not require interveners to do or refrain from doing anything. It doesn't affect any legally protectable interest. On the remedy appeal, their problem is twofold. First, interveners waived their gerrymandering argument because they never raised it in the remedial proceedings below. And second, no intervener colorably alleges an injury from the remedial map. Their appeals should accordingly be dismissed. Now, on liability, interveners concede that the court order doesn't require anything of them. Instead, they claim they have standing to challenge the liability order because the subsequent remedy order allegedly injures them. But, Judge McEwen, your questions hit the nail on the head. Standing is not dispensed in gross. They can't hinge their standing in one appeal on an order they're challenging in a separate subsequent appeal. They argue that the remedial map flows inexorably from the liability appeal to try to get around this pretty significant problem. Well, as I heard their argument, and of course I don't want to reframe it and we'll let counsel do that, but they said you're just straight up, the harm is being sorted by race. That was done on the liability side. Therefore, standing. And I think we're speaking to Mr. Trevino. I understand from the briefing that the sorting that Mr. Trevino now complains of is the remedial map. And probably reason number one why I understand that is because he intervened to defend legislatively enacted LD-15. So for him to now claim he was injured by being sorted in that district is just flatly inconsistent. So on this remedial point, interveners try to suggest that Section 2 remedies inevitably raise 14th Amendment concerns. At any time you remedy a Section 2 violation, you're sorting voters. But the Supreme Court has rejected this argument time and again, most recently in Milligan. They also argue that the alleged gerrymandering flows from the liability map. But Judge Owens, you gave a good example, I think, of why that's true, and why that's not necessarily true with your one-inch hypothetical. And I'd like to give some other examples. So first, if the court had simply adopted Mr. Trevino's proposed remedial map, and he did propose a remedial map, he obviously wouldn't have been injured. He wouldn't be here today. So that would have been a remedial map that would not have, by his own light, sorted him. Secondly, the court could have adopted a remedy in which Mr. Trevino's house, Granger, Washington, was not in the remedial district, the now allegedly gerrymandered district, in which case he's obviously not subject to any alleged sorting. So this notion that the remedy flowed inexorably from the liability determination is simply not true. But he is in LD-14, correct? In the current one, yes. In the current one, and Granger falls within that, correct? It does, yes. But if you look at cases like Alliance for Hippocratic Medicine, he basically has to show that it was inevitable, that the court's ruling would have inevitably led to this action that he now claims him harm. And for the reasons I've just discussed, he can't do that. Now, he cited an argument opposing counsel, I think the Shaw case. I think that's the name. I'm going to make sure I've got the right one. Can you speak to that case and to why? Yeah, Shaw v. Hunt. So I understood him to refer to Shaw for the purpose simply that a racial sorting is an individual injury. And I don't disagree with that. It's just that he's failed to show it here. Well, it's two things. First, it has nothing to do with the liability order, which he's appealing. Secondly, even on the remedial point, he still has to show that he was, in fact, racially sorted. He has to raise a colorable claim that he was, in fact, racially sorted to even get in the door of this courtroom. And he hasn't done that. And I'll get to that on the merits. I'll get to that in a moment, but let me just very quickly raise a point that Judge McKeon raised about waiver. And I see I'm running short on time, so I'm going to try and speak quickly, but not too quickly. So Intervenors' first problem on the remedial order is that they never argued that any of the remedial maps offered by plaintiffs were racial gerrymandering. There was full briefing. Their response to plaintiffs' remedial maps, Washington SCR 50, I invite you to take a look. There's no whisper in there that Mr. Trevino is being racially gerrymandered, that this map violates equal protection. At Intervenors' request, the court held an evidentiary hearing in which the court said, I want to focus on Map 3A. Intervenors introduced an expert declaration. They had a deposed witness. They didn't depose. They examined witnesses. They had their own expert witness. No whisper that there was a gerrymandering claim. And, finally, they submitted more. Well, on that point, it might be just a whisper. I don't know how we would characterize it. But in the transcript of that hearing, I thought they pointed to these questions on FER 7 about whether counsel consulted racial and political data or whether they were given guidance on how to draw the map. Is that enough to raise the equal protection claim? No, because they never objected that this was a gerrymandered map, nor did they elicit any actual evidence, nor did they cite any such evidence in their brief. And when I asked counsel about that, he said, well, you really have to go back to the complaint because we did allege in broad terms equal protection. They alleged when they sought to intervene that they were intervening to protect their sort of generalized rights under the 14th Amendment. What Judge Lasnik held correctly, I'll note, is that they couldn't intervene. They had no legally protectable interest because all they were alleging is a general interest in being treated equally under the 14th Amendment, which fair enough. But there was at that point no basis to suggest that any remedial map, because there was no remedial map, that the proceedings would implicate their 14th Amendment rights at all. So they are permissive intervenors, is that correct? They're merely permissive intervenors, yes, Your Honor. I do want to indulge any questions you have, but I'm also now cutting into Ms. Harless's time. So unless there are any questions, I would like to turn over the mic to Ms. Harless. No questions here. Thank you so much. Really appreciate your time. May it please the Court, Annabelle Harless on behalf of the Soto Palmer Police. So I want to address first a couple of the things Intervenors' Counsel raised, including plaintiffs' ability to even challenge a district that has a majority Hispanic citizen voting age population, because that is one of the main arguments they make here on appeal. But that argument flies in the face of Supreme Court precedent, as well as that of numerous other circuit courts across the country, in addition to Congress' intent behind Section 2. The 1982 amendments to Section 2 arose out of cases where minority voters had a numerical advantage, but still the Court found vote dilution based on totality of the circumstances in an effects test. Six other circuits also allow plaintiffs to challenge a district with a majority-minority population for vote dilution under Section 2, including the 2nd, 5th, 7th, 8th, 11th, and D.C. circuits, with none of the narrow restrictions that intervenors have sought to impose here. There is something maybe counterfactual here where you have a resorting of the district, LD15 to LD14, and the concern, of course, is the impact or the ability for minority voters to have a fair vote, but you end up with less minority voters. So, that's one of their challenges. They gave us the statistics, 52.6, 50.2 approximately. So, how do you defend that? Well, first of all, that statistic is wrong. The Plaintiffs' Remedial District has a 51% Hispanic citizen voting age population, using the 2022 numbers, and the Enacted District has a 52% Hispanic citizen voting age population. And so, there's a 1% difference between those districts. Are you saying that LD14 has 1% more than LD15 under current statistics? 1% less. 1% less. They gave a 2% less. Okay, well, it was a margin. It was a small amount, but my question kind of really remains the same, and that is you reduced the percentage of Hispanic voters, correct? Not you, but the proposed map. So, the Hispanic citizen voting age population demographic number is less in the remedial map, but that's because Section 2 doesn't require a demographic target. It requires equal access and equal opportunity, and so that's not how courts determine whether vote dilution is illegal. I mean, I know there's no bright-line test. We've already been told that, right? There's no bright-line test, but courts generally look to assess electoral opportunity in the district, and the Supreme Court has done so when analyzing equal opportunity and looks at election results, and it's done that in the Lulag v. Perry cases and the Abbott v. Perez case. And here, plaintiff's expert and the state's expert found that under Legislative District 15, Latino-preferred candidates usually lost in 70% of the races, but under the remedial district, Latino-preferred candidates won in 8 out of 8 elections. So, there's no doubt. Even intervener's expert testified that the remedial district provides equal opportunity to Latino voters. So, the Hispanic citizen voting age population demographic alone does not determine whether there's equal opportunity. What about the number of districts affected? Again, there's no strict number that we've gotten, but you're going to have to jiggle some districts, and they're saying too many jiggled. Well, the district that required being remedies in the center of the state of Washington, and it's a large, sparsely populated area, and each of those districts, Legislative District 14 and Legislative District 15, are surrounded by five or six other districts. So, once you start moving the boundaries of those districts, you are inevitably going to create a ripple effect that works its way out while you're adjusting for equal population, other traditional redistricting criteria like compactness and contiguity. And so, the district court found that the map 3B that it adopted at the remedial phase best balanced all of the traditional redistricting criteria and that those changes were necessary to comply with the state's policy objectives like uniting as much of the Yakima Reservation with its off-reservation lands. And I was going to ask you about that. What role the tribe, well, the Yakima tribe, played in terms of its population in drawing the map? What consideration did the district court give that? So, the district court weighed, well, the district court didn't draw the map. I understand. But the map jar weighed, you know, uniting. But, yeah, the district court was looking at the panoply of maps. The map jar weighed uniting as much as possible of the Yakima Nation with its off-reservation trust lands with equal population, uniting the Latino community of interest, compactness, contiguity. It was essentially a factor that was considered in balancing the district and making sure that all criteria were complied with. I would appreciate your comment. The vote dilution is still a little bit murky for me from both sides. So, with respect to the remedial phase, is it your understanding that Mr. Trevino has a vote dilution claim? No, Your Honor. Mr. Trevino, I mean, Mr. Trevino doesn't have any claim, but he certainly doesn't have a vote dilution claim, and he hasn't alleged one. He is alleging that the remedial map, I guess I'm not 100 percent sure what he's alleging because I don't think he has established any kind of harm. But what he is saying is that the remedial map is a racial gerrymander. It violates equal protection in his view, correct? Yes. But he didn't raise that claim below. And what interveners refer to in their motion to intervene is simply a generalized grievance, asking the court to comply with the law. But it was not an objection in any way to Plaintiff's remedial maps, which were not even in existence until two years after that. So there's just no way that his intervention papers can establish standing to challenge the remedial district. Interveners' counsel also jumped to narrow tailoring, but he hasn't even shown that race predominated in the drawing of the district, nor could they because they've waived that claim and don't have standing to bring it. But Plaintiff's map drawer didn't even look at race when he was drawing the remedial district, didn't consider racial demographics, wasn't otherwise aware of the demographics of the region. And so it's not even clear how Mr. Trevino can establish that he was racially assorted in the remedial district. I also wanted to address intervener's argument about causation at the racially polarized voting stage. Interveners attempt to insert a causation requirement into the third jingles precondition, but again, there's no legal precedent from the Supreme Court or this court that actually imposes such a requirement on plaintiffs. Do we have any other court other than the Fifth Circuit that has done that? No, Your Honor. And the Fifth Circuit's approach to that is in tension with jingles and the recent Milligan decision because in Milligan, the Supreme Court held that establishing the third jingles precondition shows that the challenge districting scheme thwarts the minority vote at least plausibly on the basis of race. And requiring consideration of causation at the jingles precondition stage, as the Fifth Circuit does, is in direct conflict with that holding. This court has also held in vote dilution claims that establishment of racial black voting provides the requisite causal link between the voting procedure and the discriminatory result, including in the Gomez Old Person 1 and the Blaine County cases. And six other circuits take this approach as well and allow for consideration of partisanship only at the totality of the circumstances phase. The District Court faithfully followed this precedent here and applied the jingles preconditions as set out by the Supreme Court and this court. And it was undisputed at the District Court that voting in the region is racially polarized. All four experts, including intervenors and states expert who looked at the issue, found that Latino voters cohesively preferred the same candidate in all but one race and that white voters routinely block vote against Latino preferred candidates. And the District Court considered intervenors' partisanship argument correctly at the totality of the circumstances phase and found it unavailing. And intervenors can identify no clear error in that conclusion on appeal. And that's because as the state's expert, who normally testifies on behalf of state governments defending against Section 2 claims, testified at trial, the evidence shows that there is, quote, a real ethnic effect on voting in this area. An intervenor's own expert found that even where Latino voters cohesively preferred a Hispanic Republican candidate, such as the 2020 Superintendent of Public Instruction race, that candidate lost due to white voting patterns. The record here simply does not demonstrate that partisanship is the best explanation for racially polarized voting in the Yakima Valley. And the District Court did not err on that basis. I want to jump to another argument that intervenors' counsel made, which is about the narrow tailoring of the district. Again, we think we don't even get to this point because they've waived their racial gerrymandering claim. They don't have standing to bring the claim. They have not shown that race predominated. But if we are addressing narrow tailoring, the district is narrowly tailored because there's no evidence that the District Court, there's no evidence that race even predominated in the drawing of the district lines. Contrary to intervenors' comments a moment ago, the map didn't make partisan changes. The partisan balance of the state legislative map remains the same. It still has a modest Republican tilt. No districts were flipped from one party to the other. Intervenors' own expert testified that one of the districts intervenors' counsel was referring to, Legislative District 12, retained a Republican edge, and the other district he mentioned was classified as a toss-up and remained a toss-up. And Washington state law encourages competitive districts in redistricting, and nothing that the District Court here did changed that in adopting the remedial map. Intervenors' counsel also brought up Map 5A as an alternative that could have been adopted to Map 3B, but the District Court found that Map 3B best complied with traditional criteria while remedying the violation, and intervenors are simply disagreeing with that decision. But Map 5A didn't unify as much of the Yakama Nation with the off-reservation trust lands, which is something the intervenors themselves raised below as an important consideration, and that is the reason why the District Court found that Map 5A was not sufficient as a remedy. Counsel, if you want an extra two minutes, I'm giving that to the appellant, so if you want to stay at two minutes. Thank you. I don't think I need an extra two minutes. I have maybe one last question for you, and that is this shape of the district, which the intervenors say is really inexplicable or unexplainable, I guess is their term, except by racial grounds, and we've seen odd-shaped districts in cases, you know, Shaw, Bush, et cetera. What is the legal principle for whether a shape is too inexplicable or unusual, and where to draw the line for the court? I think a lot of the time when the court is talking, when courts are analyzing the shape, they're looking at how the district complied with other traditional redistricting criteria and whether the populations within that district, you know, are close together, or there's no bright-line rule for the shape of this one is too crazy and the shape of this one's fine. But here, the shape of the district, the reason for the shape of the district is in the record, and it's because of the location of the Yakima Reservation and the off-reservation trust lands, and that is the main factor that has shaped the shape of the remedial district. And so intervenors themselves requested that those lands be added to the district, and that is what made the shape the way it is, and so it's misleading at best that they are now claiming the shape is based on a racial target rather than complying with the state's policy objectives. Latino voters in the Yakima Valley have long been shut out of the political process. After evaluating the extensive record below, the district court found that legislative District 15 diluted Latino voting strength in violation of Section 2, and after a robust remedial process, the court selected a tailored remedial map that remedies the violation while respecting the state's policy objectives, complying with traditional redistricting criteria, and state and federal law. This court should affirm the lower court's decisions, which give Latino voters a voice in state legislative elections in the region. Thank you, Counsel. Thank you, Your Honors. I appreciate the extra two minutes. To respond very quickly, first, standing cannot be waived. That is, contrary to what is being said here, the standing cannot be waived. Now, the procedural history below was a little more complicated as it pertains to the remedy. There was an objection at the very first opportunity to object to the map that we knew was going to be enacted. It was not until February 9th, weeks after all briefing on the remedy had closed, that the court indicated he was considering Map 3A. At the next hearing, as Judge McCone previously stated, there was an objection on the record. There were questions that went in to what context race was sorted and used in identifying this, and that was on the March 8th. Is that the only place that I can look to to see what was raised? Do you have any other citations? In the briefing, Your Honor, it's kind of all over the place, in that the remedial districts simply further sort by race, every single one of them. And that is core of all the briefing that we filed. At the point, though, we did not have, we didn't know what the court was going to adopt. No, but there were signals put out there as to what was going on. And was there anything that would have prevented you from filing an objection like you did before? Now that you knew which way the wind was blowing? Because the problem that I'm having, just to be honest with you, is trying to dig through this whole record and find out where the equal protection claim was preserved. You've pointed to that one spot in the colloquy, the cross-examination. But I don't see anything else, so I'm looking for more. Yes, Your Honor, it's very clear. Mr. Hughes misstated, if I may request a few extra seconds to answer this question. Yes. Mr. Hughes misstated what Mr. Trevino intervened to do. He says he intervened to defend the enacted map. Mr. Trevino intervened because he did not want to be sorted on the basis of race. That is why he intervened. And plaintiffs were asking the court to sort him on the basis of race. And again, as the court has held, it is the racial sorting itself, not the justification that leads to it, that is sufficient for Article III standing. And the court's fundamental goal of drawing the remedial district was to combine Hispanic communities in central Washington. The tentacles of the octopus slithering along the bottom of the ocean floor was not to combine the Yakima Reservation. There is no ocean out there. You understand that, right? I understand that, Your Honor. But there are neither other dragons or salamanders. But anyways, I would note that the Yakima Nation, the court referenced earlier, they filed and were opposed to the remedial map. If there's no other questions. Thank you. No further questions. Thank you. We appreciate the strong arguments of both parties. In that case, Palmer will now be submitted and the parties will hear from us in due course.
judges: McKEOWN, GOULD, OWENS